**In re ALLEGHENY INTERNATIONAL, INC. et al.**

**J. Daniel Snyder, Appellant.**

**No. 90–3400.**

United States Court of Appeals, Third Circuit.

Argued May 13, 1991.

Decided Jan. 21, 1992.

Before HUTCHINSON, COWEN and SEITZ, Circuit Judges.

OPINION OF THE COURT

HUTCHINSON, Circuit Judge.

J. Daniel Snyder (Snyder) appeals an order of the United States District Court for the Western District of Pennsylvania. That order affirmed a decision of the United States Bankruptcy Court for the Western District of Pennsylvania. The bankruptcy court had disallowed Snyder's claim for compensation in accord with a written employment contract dated April 16, 1986, between Snyder and Allegheny International, Incorporated (Allegheny), the debtor in a Chapter 11 bankruptcy proceeding. We will vacate the district court's order affirming the bankruptcy court and remand the case to the district court so that it may vacate the bankruptcy court's judgment and remand the case to the bankruptcy court for further proceedings consistent with this opinion.

The bankruptcy court had concluded that Snyder's negligence in the performance of contractual duties was a material breach of the 1986 contract. It based that conclusion on findings concerning Snyder's acts and omissions in carrying out his responsibilities under an earlier contract with Allegheny. The bankruptcy court made no findings on the parties' general state of mind or knowledge about Snyder's earlier derelictions when they entered into the 1986 contract. Such findings are necessary under applicable Pennsylvania contract law to dispose of Allegheny's contention that Snyder's pre-contract acts or omissions gave Allegheny the right to terminate Snyder's contract.[1] More specifically, further find-

Stephen Yakopec, Jr., Ronald W. Crouch (argued), Buchanan Ingersoll Professional Corp., Pittsburgh, Pa., for Allegheny Intern., Inc.

Jeffrey S. Powell (argued), Roger L. Taylor, Kirkland & Ellis, Chicago, Ill., for J. Daniel Snyder.

1. Allegheny's reorganization plan has been confirmed. *In re Allegheny Int'l, Inc.,* 118 B.R. 282 (Bankr.W.D.Pa.1990). After confirmation, a bankruptcy court's authority is normally limited "to matters concerning the implementation or execution of a confirmed plan." *Goodman v. Phillip R. Curtis Enters.,* 809 F.2d 228, 232 (4th Cir.1987); *see* 11 U.S.C.A. § 1142 (West Supp. 1991). Here, however, the bankruptcy court has exercised its discretion to retain jurisdiction over the claim at issue in accord with our decision in *In re Smith,* 866 F.2d 576, 580 (3d Cir.1989). Section 10.03 of the Joint Stock Plan provides:

10.03 *Retention of Jurisdiction*
Notwithstanding confirmation of the Plan or the Effective Date having occurred, the Court shall retain jurisdiction for the following purposes:
(a) Determination of the allowability of Claims and Interests upon objection to such Claims by a Debtor, the Reorganized Companies or other successor to any of the Debtors or by any other party in interest provided the objections are filed within ninety (90) days

ings are needed on whether Snyder knowingly misrepresented sales and cost figures for the subsidiaries he had previously supervised for Allegheny, concealed accounting improprieties in those divisions that would have been material to Allegheny's decision to promote him, or knowingly failed to disclose them when he knew or should have known that Allegheny would rely on the false figures in promoting him, and whether Allegheny acted negligently in not discovering the truth before promoting Snyder or is otherwise precluded from relying on Snyder's misrepresentation, concealment or failure to disclose.

## I.

On February 20, 1988, Allegheny filed a petition for relief under Chapter 11 of the bankruptcy code, 11 U.S.C.A. §§ 1101–1174 (West Supp.1991), in the United States Bankruptcy Court for the Western District of Pennsylvania. Snyder filed a claim against Allegheny in the Chapter 11 proceeding alleging that Allegheny owed him $1,378,650.00 under his employment agreement with Allegheny. He also sought interest, costs and attorney's fees. Allegheny objected to Snyder's claim contending that he was terminated for cause.

On October 30, 1989, after an evidentiary hearing, the bankruptcy court sustained Allegheny's objection to Snyder's claim. The court held that Allegheny's evidence was sufficient to overcome the *prima facie* validity of the claim. It also held that Snyder failed thereafter to present enough evidence to sustain his claim. Snyder filed a timely notice of appeal to the district court from the bankruptcy court's judgment. *See* 28 U.S.C.A. § 158(c) (West Supp.1991); Bankr.R. 8002. The district court affirmed the order of the bankruptcy court in an order and accompanying memorandum opinion. Snyder then filed a timely notice of appeal from the district court's judgment. That appeal is now before us for decision.

## II.

Snyder's career with Allegheny began when he started working for True Temper, a subsidiary of Allegheny, on April 19, 1976. Snyder left True Temper on September 22, 1978, but returned to work for Allegheny on December 1, 1979. He received various promotions over the next five years and acquired something of a reputation as a "turn-around specialist," *i.e.*, an executive who could turn an unprofitable operation into a money-maker. In 1984, Snyder became President of Allegheny's Engineered Products Division. In that position, he was responsible for nine of Allegheny's subsidiaries, including Bra–Con Industries (Bra–Con) and Sciaky Brothers (Sciaky), two troubled subsidiaries whose reports projected a loss for the year ending December, 1984, when Snyder took over. The initial reports after Snyder took over conformed to his reputation as a "turn-around specialist". For example, they showed a turn-around from a projected loss of $200,000.00 at Bra–Con in October to a profit after taxes of $316,000.00 by December. His reputation enhanced, Snyder became responsible for eight more of Allegheny's subsidiaries in May of 1985.

A year later, in April of 1986, Snyder's superiors at Allegheny decided to promote him to Vice President in Charge of Operations Planning. On April 16, 1986, Snyder and Allegheny executed a written employment agreement designating Snyder Vice President in Charge of Operations Planning. This agreement was signed on Allegheny's behalf by F. George Scott (Scott), Allegheny's Senior Vice President of Human Resources, and attested to by another person whose position with Allegheny does not appear and whose signature is illegible. The contract gives no indication on its face that it is not immediately effective or otherwise conditioned on later ratification by any other person or body within Allegheny. Snyder testified that this promotion changed his role with Allegheny and that he no longer was responsible for the seven-

after later of the Effective Date and the date the proof of Claim or Interest being objected to is filed or last amended[.]
The bankruptcy court's Confirmation Order specifically referred to this section of the Joint

Stock Plan (the name of the reorganization plan in this case). *See In re Allegheny Int'l, Inc.,* 118 B.R. at 322. Here, the objections were filed years before the Effective Date of the Plan.

teen subsidiaries that included Bra–Con and Sciaky.

Under the 1986 agreement, Snyder was obligated to "use his best efforts to promote the interest of" Allegheny and to "exert his best and most diligent efforts to perform the services and undertake the duties" assigned to him by Allegheny. Appellee's Supplemental Appendix (Supp. App.) at 3. Paragraph four of the agreement made Snyder's new employment contract effective for an indefinite term. It provided in relevant part:

> The term of this Agreement shall commence on the date set forth in the opening paragraph hereof [April 16, 1986] and shall continue until the occurrence of one of the following events described in clauses (a) through (d), at which time the term hereof shall cease and the employment provided for hereunder and the obligation of the Corporation [Allegheny] to pay and provide the salary provided hereinabove shall terminate, (a) the death or permanent disability of Employee [Snyder], (b) the voluntary termination of his employment with the Corporation by the Employee following the giving of the required notice by him as described in the immediately succeeding sentence, (c) the breach of this Agreement by Employee, or (d) three years after the date the Corporation shall have notified the Employee in writing that it elects to terminate his employment hereunder.

Appellant's Appendix (App.) at 19–20.

Thereafter, on July 22, 1986, the agreement dated April 16, 1986 was submitted for approval to Allegheny's Management and Human Resources Committee (Committee). It was approved that same day. By this time, however, Snyder's superior, Robert J. Buckley (Buckley), Allegheny's Chairman and Chief Operating Officer, had become aware of serious questions concerning the accuracy of the figures that indicated Bra–Con and Sciaky had become profitable under Snyder's tutelage by the end of 1984 and had continued to be profitable in 1985 and 1986.

Allegheny had adopted a Statement of Corporate Policy for its executives like Snyder. It was in effect both before and after execution and approval of Snyder's 1986 contract as Vice President in Charge of Operations Planning. The policy statement required Snyder's "[c]ompliance with accepted accounting rules and controls ... at all times. The books of account, budget proposals, economic evaluation for projects and the like must truly reflect the transactions they record." Supp.App. at 45.

In January of 1986, in a series of letters to Buckley, Snyder submitted his annual affirmation that he knew of no transaction or event that had violated Allegheny's corporate policies at Bra–Con, Sciaky or the other Allegheny subsidiaries over which he had general supervisory responsibility. Sometime in April or May of 1986, however, Brian Roche (Roche), Allegheny's Director of Internal Audit, was directed to conduct an investigation and audit of Bra–Con and Sciaky. It is not clear whether Roche was told to conduct that investigation before Snyder's contract was signed on April 16. There is, however, no evidence in the record to show that any of Snyder's superiors knew of the improprieties before July 16, 1986 when Buckley, Scott, Roche and Snyder met to discuss the result of Roche's investigation.

Roche proceeded to look into the accounting practices of Bra–Con and Sciaky during the years 1984, 1985 and 1986. He concluded that, at Snyder's direction, sales of equipment at Bra–Con and Sciaky were recognized earlier than they should have been. Specifically, Bra–Con recognized $10,000,000.00 of sales in the fourth quarter of 1984 that it should not have recognized until 1985. Sciaky likewise recognized $6,000,000.00 of sales in the fourth quarter of 1984 that it should have recognized in 1985. The bankruptcy court found that these early recognitions "substantially inflated" the 1984 operating results for the subsidiaries and that the false enhancement allowed Bra–Con to show a profit. As previously stated, the forecast for Bra–Con prepared by a predecessor of Snyder, as of October, 1984, had predicted a loss. Similar discrepancies were noted for the years 1985 and 1986.

The bankruptcy court found that the early recognition of sales, as well as an improper deferral of costs it found was related to the premature recognition of sales, later caused Allegheny to take a $2,800,-000.00 write-off. Additionally, the bankruptcy court found that an additional $1,000,000.00 Allegheny later wrote off was the result of a reversal of a sales entry at Bra–Con. Finally, it found the early recognition of sales and resulting deferral of costs conflicted with generally accepted accounting standards as well as Allegheny's corporate policy and concluded that Snyder was responsible for all of these write-offs.

The results of the audit were discussed by Buckley, Snyder, Roche and Scott on July 16, 1986, three months after Scott had signed Snyder's new contract. At that time, Buckley told Snyder he had to take some of the responsibility for the accounting improprieties. No immediate action was taken against Snyder. Roche's investigation continued. On July 23, one day after the Committee approved Snyder's contract, Roche submitted a supplemental report to Buckley. Roche testified that this supplemental report confirmed his earlier conclusion that there was neither invoicing nor customer approval of the sales that were prematurely recognized in violation of proper accounting practices. On this evidence, the bankruptcy court found that the investigation was ongoing as of July 22 when the Committee officially approved Snyder's new employment agreement. Buckley and Scott attended the July 22 meeting of the Committee. There is no evidence in the record that the other members of the Committee were advised of the investigation concerning Snyder. There is likewise no evidence the other Committee members otherwise had any such knowledge before they approved Snyder's new contract.

In August of 1986, Oliver Travers replaced Buckley as Chairman and Chief Executive Officer of Allegheny. Travers tried to negotiate a severance agreement with Snyder. These negotiations failed and Travers fired Snyder on October 31, 1986 because of the accounting improprieties Roche had discovered. Twenty-seven Allegheny executives were removed from their positions between December, 1985 and October 31, 1986, but only two, Buckley and Snyder, were terminated for cause.

### III.

The bankruptcy court had jurisdiction over Snyder's claim under 28 U.S.C.A. § 1334(a) (West Supp.1991) and 28 U.S.C.A. § 157(a) (West Supp.1991). The district court had jurisdiction over Snyder's appeal from the denial of his claim under 28 U.S.C.A. § 158(a) (West Supp.1991). We have jurisdiction over Snyder's appeal from the district court's final order affirming the denial of Snyder's claim under 28 U.S.C.A. § 158(d) (West Supp.1991).

In cases originating in the bankruptcy court, we occupy a second tier of appellate review. We have described that scope of review as follows:

[T]his court's review of the district court effectively amounts to review of the bankruptcy court's opinion in the first instance. See Ram Constr. Co. Inc. v. American States Ins. Co., 749 F.2d 1049, 1053 (3d Cir.1984) (citing Universal Minerals, Inc. v. C.A. Hughes & Co., 669 F.2d 98, 102 (3d Cir.1981)). Beyond this basic premise, it is settled law that this court applies a clearly erroneous standard to findings of fact, conducts plenary review of conclusions of law, and must break down mixed questions of law and fact, applying the appropriate standard to each component. See, e.g., Resyn Corp. v. United States, 851 F.2d 660, 664 (3d Cir.1988); In re Jersey City Medical Center, 817 F.2d 1055, 1059 (3d Cir.1987); Ram Constr. Co., Inc., 749 F.2d at 1052–53; Universal Minerals, Inc., 669 F.2d at 101–02.

In re Sharon Steel Corp., 871 F.2d 1217, 1222 (3d Cir.1989). With respect to the clearly erroneous standard, the Supreme Court of the United States has said:

If the district court's account of the evidence is plausible in light of the record viewed in its entirety, the court of appeals may not reverse it even though convinced that had it been sitting as the

trier of fact, it would have weighed the evidence differently. Where there are two permissible views of the evidence, the fact-finder's choice between them cannot be clearly erroneous. *United States v. Yellow Cab Co.*, 338 U.S. 338, 342 [70 S.Ct. 177, 179, 94 L.Ed. 150] (1949); *see also Inwood Laboratories, Inc. v. Ives Laboratories, Inc.*, 456 U.S. 844 [102 S.Ct. 2182, 72 L.Ed.2d 606] (1982). *Anderson v. City of Bessemer City, N.C.*, 470 U.S. 564, 573–74, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948), *quoted in Anderson*, 470 U.S. at 573, 105 S.Ct. at 1511.

### IV.

Against this procedural and factual background, we turn to the merits of Snyder's appeal.

### A.

Our examination of the record satisfies us that all of the bankruptcy court's factual findings Snyder attacks are supported by sufficient evidence. Indeed, there was ample evidence to support them. Therefore, we reject Snyder's arguments that some of the subsidiary findings of fact essential to the bankruptcy court's conclusion that Snyder was negligent were clearly erroneous. Accordingly, we will accept the following facts found by the bankruptcy court as true: Allegheny's internal investigation of the improper accounting practices was not closed at the July 16 meeting; Allegheny held Snyder responsible for the improper deferral of costs and fired him for that practice; the improper deferral of costs and the early recognition of sales were related; Snyder should have known that sales were recognized without invoices; Snyder did not comply with accepted accounting procedures; Snyder did not use his best efforts to promote Allegheny's interest; Snyder initiated the practice of early recognition of sales; and sales should not be invoiced prior to the product's substantial completion.

### B.

Snyder also says that the bankruptcy court committed various errors of law.

### 1.

Snyder first argues that he carried his ultimate burden of proof by showing that he was fired not for cause but because he refused to accept a severance agreement offered in connection with a general reduction-in-force at Allegheny. Since Snyder had the burden of satisfying the bankruptcy court that his claim was well founded, we could at once construe this as a contention that no reasonable fact-finder could deny his claim on the evidence presented. Because Snyder makes this argument in the special context of bankruptcy practice with respect to proofs of claim and objections to them, we will, however, comment briefly on it.

The burden of proof for claims brought in the bankruptcy court under 11 U.S.C.A. § 502(a) rests on different parties at different times. Initially, the claimant must allege facts sufficient to support the claim. If the averments in his filed claim meet this standard of sufficiency, it is *"prima facie"* valid. *In re Holm*, 931 F.2d 620, 623 (9th Cir.1991) (quoting 3 L. King, *Collier on Bankruptcy* § 502.02, at 502–22 (15th ed. 1991)). In other words, a claim that alleges facts sufficient to support a legal liability to the claimant satisfies the claimant's initial obligation to go forward. The burden of going forward then shifts to the objector to produce evidence sufficient to negate the *prima facie* validity of the filed claim. It is often said that the objector must produce evidence equal in force to the *prima facie* case. *Id.; see In re Windsor Communications Group, Inc.*, 45 B.R. 770, 773 (Bankr.E.D.Pa.1985). In practice, the objector must produce evidence which, if believed, would refute at least one of the allegations that is essential to the claim's

legal sufficiency. If the objector produces sufficient evidence to negate one or more of the sworn facts in the proof of claim, the burden reverts to the claimant to prove the validity of the claim by a preponderance of the evidence. *See In re WHET, Inc.*, 33 B.R. 424, 437 (Bankr.D.Mass.1983). The burden of persuasion is always on the claimant. *Holm*, 931 F.2d at 623 (quoting *Collier* § 502.02, at 502–22); *Windsor Communications*, 45 B.R. at 773.

■] The bankruptcy court found that the cause of Snyder's termination was his performance in his earlier job of supervising the seventeen subsidiaries that included Bra–Con and Sciaky. Bearing in mind our analysis of burden of proof sur objections to claims in bankruptcy, we think Snyder's argument that the bankruptcy court erred in refusing to accept the reason he advanced for termination resolves itself into either an attack on the bankruptcy court's fact-finding, subject to review for clear error or an attack on its conclusion that Snyder had not carried his burden of persuasion, subject to plenary review, as to whether the evidence would have persuaded any rational fact-finder that Snyder was not fired for cause. Viewed, either way we reject it. The underlying findings are not clearly erroneous and Snyder's argument that he carried his ultimate burden of persuading the bankruptcy court lacks merit.

**2.**

Snyder's second assertion of legal error concerns the "best efforts" clause in the agreement. He maintains that an employee's compliance with a best efforts clause must be considered in light of all the surrounding circumstances and that here the bankruptcy court failed adequately to consider the circumstances. Again, to the extent that this argument attacks the bankruptcy court's factfinding on the adequacy of Snyder's performance of his earlier duties, our conclusion that the bankruptcy court's findings concerning Snyder's performance at Bra–Con and Sciaky are not clearly erroneous disposes of it.

**3.**

■ Snyder also argues, however, that the best efforts clause in his new contract only requires best efforts in the new tasks that Allegheny could assign to him under paragraph one of the 1986 employment agreement.[2] Snyder's argument that the best efforts clause has no relation to his earlier performance is just a specific aspect of his final legal argument that his pre-contract performance cannot possibly be a breach. If that argument is accepted in its more general formulation, nothing Snyder did before the written contract was made has any relevance to the bankruptcy proceedings on his claim and, as a corollary, none of the provisions of the written con-

**2.** Paragraph one reads:
During the term of this Agreement, [Snyder] agrees to be employed by [Allegheny] and [Allegheny] agrees to employ [Snyder], and as an employee, [Snyder] shall exert his best and most diligent efforts to perform the services and undertake the duties for [Allegheny] and its subsidiaries as may be assigned to him by or under authority of the executive officer of [Allegheny] *to whom he shall report* or in whose area of responsibility he shall be assigned. [Snyder] shall devote his full employable time to the performance of such services and duties and shall use his best efforts to promote the interests of [Allegheny] and its subsidiaries. [Snyder] shall, at the pleasure of [Allegheny], serve on such boards of directors and committees of [Allegheny] and its subsidiaries and hold such offices with [Allegheny] and its subsidiaries, including those offices, directorships and committee memberships, if any, now held, to which he may be duly elected or appointed. If [Allegheny] elects to terminate [Snyder]'s employment as provided in clause (d) of paragraph 4 hereof, thereafter [Snyder] shall perform those duties and services as may be assigned to him, which shall be consistent with his background and experience with [Allegheny], he shall not be relocated or reassigned to an office or other location in another city, without his consent and approval, and he shall continue to carry an executive-level job title equivalent to that theretofore held (but without, unless [Allegheny] so desires, any functional or department head designation or other similar appellation). [Snyder]'s reasonable efforts which he pursues to find other employment under circumstances where [Allegheny] has *elected to terminate his employment shall not* be considered in breach of his obligations hereunder.
App. at 17–18.

tract, including the "best efforts" clause, can be used to terminate his contract because of these earlier acts. We therefore turn to an analysis of Snyder's general argument that pre-contract acts or omissions cannot support a conclusion that he materially breached his later contract and so cannot justify Allegheny's unilateral termination of it.

### a.

Preliminarily, we will consider Snyder's discrete attack on the district court's rationale for affirming the bankruptcy court. The district court concluded that the accounting violations Allegheny gave as the reason for Snyder's discharge were continuing beyond the time that his new contract was made. Snyder contends that even if the accounting improprieties the bankruptcy court found at Bra–Con and Sciaky did continue beyond the date that he began his new duties, they were not his responsibility because he no longer had oversight responsibility for Bra–Con and Sciaky. Accordingly, he says those continuing improprieties could not constitute a breach of his contract as Vice President in Charge of Operations Planning.

We agree with Snyder on this point. The district court's affirmance on the rationale of a continuing violation of corporate policy cannot stand unless Snyder's negligence in connection with the problems at Bra–Con and Sciaky was shown to continue after April 16, 1986, when Snyder began his duties as Vice President in Charge of Operations Planning. Such a showing of continued negligence has two elements. The record would first have to contain a finding that Snyder's new duties left him with continuing supervisory responsibilities over Bra–Con and Sciaky and evidence sufficient to support that finding. It would also have to contain findings on the extent of those responsibilities and sufficient evidence to support them. Only then could we begin to consider the question of whether Snyder, in his new job, failed to exercise that degree

of care over the subsidiaries he formerly supervised that the governing Pennsylvania law requires a reasonable corporate executive in Snyder's new position to exercise. The record before us has no such findings, and the contract itself leaves Snyder's new duties wholly undefined. It gives us no help on the extent or existence of any continuing supervisory duties Snyder might have had over Bra–Con and Sciaky. There is likewise no evidence showing just what duties Allegheny assigned Snyder after he became Vice President in Charge of Operations Planning, and there are no specific findings on this point. Accordingly, the district court erred in holding that the bankruptcy court's order was supported by a continuing breach of Snyder's obligation to exert his best efforts in Allegheny's behalf.

### b.

Allegheny's failure to show, and the bankruptcy court's failure to find, that Snyder had continuing supervisory responsibility over Bra–Con and Sciaky or that, if he did, he exercised it slothfully or negligently requires us to consider Snyder's generalized argument that negligent performance of an agreement that the parties revoked by entering into a new agreement with different rights and obligations is not a breach of performance under the superseded agreement. As the United States Court of Appeals for the Seventh Circuit has stated, "it is axiomatic that before there can be a breach of contract there must be a contract." *Weissman v. Cole Prods. Corp.*, 269 F.2d 340, 341 (7th Cir. 1959). Perhaps because this principle is so basic, it is rarely mentioned. Though a truism, it does require analysis here because it is the principle on which Snyder relies in this case.[3] The bankruptcy court based its conclusion that Snyder was properly terminated for breach on Roche's report and other evidence concerning what happened at Bra–Con and Sciaky when

---

**3.** Snyder cites only one other case in support of this argument. It is *Golden v. Worldvision Enters., Inc.* 133 A.D.2d 50, 519 N.Y.S.2d 1, 2 (App. Div.1987) (court inadvertently focused on pre-

contract evidence in a breach of contract case), *appeal denied,* 71 N.Y.2d 804, 528 N.Y.S.2d 829, 524 N.E.2d 149 (1988).

Snyder was responsible for them prior to execution of the 1986 contract on which his claim is based. Though the record supports the bankruptcy court's finding that Snyder was negligent in that connection, the contract that this negligence breached was the contract that ended in 1986 when Snyder became Vice President in Charge of Operations. Therefore, the bankruptcy court erred in styling Snyder's negligent acts and omissions during his tenure as President of Allegheny's Engineered Products Division a breach of Snyder's new contract as Allegheny's Vice President in Charge of Operations. This error does not, however, necessarily mean Snyder's claim should be allowed. To determine that question we must examine the legal principles that govern objections based on acts or omissions that occur in connection with a contracting party's performance under earlier contracts. We turn to that subject.

### C.

Allegheny contends that Snyder's pre-formation conduct is relevant because the violations were not fully revealed until Roche's supplemental report of July 23, one day after Snyder's new contract had been formally approved on July 22. Had the Committee known of Roche's report, Allegheny says Snyder's contract would not have been approved. Therefore, it contends that the characterization of the case as one of breach of contract or fraudulent inducement is immaterial because the Committee relied on Snyder's earlier representations that he had complied with Allegheny's written corporate policies, a representation that was demonstrably false. Brief for Appellee at 35.

### 1.

■ Before reaching the merits of any objection to Snyder's claim based on fraud or mistake, we must decide whether Allegheny failed to preserve those theories as a basis for objection, either in the bankruptcy

court or on appeal. After discussing the breach of contract issue, the district court stated "there is no evidence that [Allegheny's] Management and Human Resource Committee was made aware of or discussed the ongoing Roche investigation into the accounting irregularities at Bra–Con and Sciaky." App. at 89–90. This quotation indicates the district court considered the question of Snyder's knowledge or state of mind concerning the problems at Bra–Con and Sciaky. The Committee's knowledge of Snyder's earlier acts and omissions would be immaterial to the issue of breach but, under Pennsylvania law and the Restatement of Contracts,[4] it could be determinative on whether the contract is voidable for fraudulent inducement or mistake.[5] It is not just the nature of Snyder's acts and omissions at Bra–Con and Sciaky, but those acts coupled with his state of mind about them that controls the legal issue of whether his contract as Vice President in Charge of Operations was void or voidable. Accordingly, it appears that the issue of Snyder's state of mind was before the district court.

In the bankruptcy court, Allegheny objected to Snyder's claim, alleging it terminated Snyder for cause. Allegheny's theory was that Snyder's wrongful actions while employed by Allegheny under an earlier oral contract resulted in large losses to Allegheny. Allegheny did not clearly state theories of fraud, mutual mistake as to Snyder's abilities or unilateral mistake coupled with Snyder's misrepresentations or concealment or negligent misrepresentation of facts that would reveal that mistake. Still, it is reasonably plain that Allegheny contended throughout these proceedings that Snyder's pre-contract actions justified Allegheny's termination. Allegheny relied on Snyder's pre-contract acts from the start of the proceedings on its objection to Snyder's claim.

---

**4.** In the contract, the parties specify that Pennsylvania law will apply. *See infra* at 178.

**5.** For purposes of this discussion, we will assume, but not decide, that the April 16 execution

of the contract by Scott on Allegheny's behalf did not bind Allegheny unless the Personnel Committee ratified their actions.

In this Court, at oral argument in response to a question as to what should be done if we decided to remand this case, Snyder's counsel said: "You [should] remand the case to the district court for a trial or a hearing on the issue of fraudulent inducement." [6] Allegheny, in its brief, also said several times that it would not have entered into a new contract with Snyder if it had known of the accounting problems at Bra–Con and Sciaky before April 16. It also says it would not have approved Snyder's new contract if it had been fully aware of the magnitude of Snyder's earlier derelictions on July 23. Brief for Appellee at 18, 34–35.

We do not think, under the circumstances of this case, that the error of nomenclature the bankruptcy court and the district court made in styling Snyder's derelict performance of his prior contract a breach of the later agreement on which his claim is based is fatal to Allegheny on its objections to Snyder's claim. Allegheny relied on Snyder's allegedly improper pre-contract actions as a basis for avoidance throughout the proceedings before the bankruptcy and the district courts. Therefore, the bankruptcy court's error in basing its decision on breach instead of fraudulent inducement or mistake and the district court's perpetuation of that error do not result in a waiver of the question of whether the contract was void or voidable from its inception.[7]

### 2.

Though we conclude that Allegheny has not waived fraud or mistake as a basis for its objection, we are, nevertheless, not free, on this record, simply to affirm the district court's order. By analyzing Allegheny's objections in terms of breach instead of rescission and relying on negligent performance of Snyder's earlier contract in holding Allegheny had cause to terminate, the bankruptcy court not only did not reach the question of whether Snyder's contract was void or voidable for fraud or mistake but also failed to resolve all the factual premises necessary to support a legal conclusion that Allegheny had a right to treat Snyder's contract as void from its inception. Without resolution of those factual questions, it is impossible to determine whether Snyder's employment contract with Allegheny was indeed either void or voidable, at Allegheny's option, for fraud or mistake. Our reasoning follows.

Initially, we must disagree with the contention Allegheny sets forth in its brief that it is "immaterial" whether the case is considered as a termination for breach of performance or fraud in the inducement. Though Snyder's claim could still fail if he fraudulently induced Allegheny to enter into an employment contract with him or if Allegheny acted mistakenly in doing so unless Allegheny waived fraudulent inducement and mistake as grounds for denying Snyder's claim, the governing legal principles are different.

General principles of the law of contracts teach us that if Snyder, by fraud or mistake, induced Allegheny to enter the contract on which his claim is based, it is terminable at Allegheny's option upon discovery of the fraud or mistake, unless Alle-

**6.** At oral argument the following, somewhat puzzling, colloquy also took place:

THE COURT: How are we now going to now remand it back on a new issue which neither of you decided to try in the [bankruptcy court]. We don't work appellate courts this way.
COUNSEL FOR SNYDER: First of all, Your Honor, we did try the fraudulent inducement issue.

Snyder insisted that *he* raised the fraudulent inducement issue:

THE COURT: Are you talking about a remand for an issue that was never presented in the first instance below?

COUNSEL FOR SNYDER: We presented the issue, Your Honor.
THE COURT: Of fraudulent inducement?
COUNSEL FOR SNYDER: Yes.

**7.** Because Allegheny does not "seek to enlarge its rights beyond these granted in the order appealed from," *Kutner Buick, Inc. v. American Motors Corp.,* 868 F.2d 614, 619 n. 3 (3d Cir. 1989), but only seeks to maintain those rights, *i.e.,* rejecting Snyder's claim, on a different theory, it was unnecessary for Allegheny to file a cross-appeal. *See also Scott v. University of Delaware,* 601 F.2d 76, 82 n. 12 (3d Cir.), *cert. denied,* 444 U.S. 931, 100 S.Ct. 275, 62 L.Ed.2d 189 (1979).

gheny was itself negligent or dilatory in discovering the problem. *See* Restatement (Second) of Contracts §§ 153–169 (1979). For the guidance of the district and bankruptcy courts on remand, we will discuss those general principles as they have developed under governing Pennsylvania law.

 Pennsylvania law is controlling because the contract says it is to be governed by, and construed in accordance with, the laws of the Commonwealth of Pennsylvania." App. at 28. Such "[c]hoice of law provisions in contracts will generally be given effect" in Pennsylvania. *Smith v. Commonwealth Nat'l Bank*, 384 Pa.Super. 65, 557 A.2d 775, 777 (1989), *allocatur denied*, 524 Pa. 610, 569 A.2d 1369 (1990). Under Pennsylvania law, inducing another to enter into a contract by means of fraud or a material misrepresentation, when the other party was under no duty to enter into the contract, is a key element of a claim for fraudulent inducement. *See College Watercolor Group, Inc. v. William H. Newbauer, Inc.*, 468 Pa. 103, 360 A.2d 200, 206 (1976); *Germantown Mfg. Co. v. Rawlinson*, 341 Pa.Super. 42, 491 A.2d 138, 141–42 (1985); *see also Bethel v. Crites*, 596 F.Supp. 1037, 1038 (W.D.Pa.1984) (applying Pennsylvania law), *aff'd*, *Bethel v. Agra Enters.*, 779 F.2d 41 (3d Cir.1985); *Miller v. Bare*, 457 F.Supp. 1359, 1364 (W.D.Pa.

1978) (same); Restatement (Second) of Contracts § 162.[8] The misrepresentation must be made knowingly. *See Muhammad v. Strassburger, McKenna, Messer, Shilobod & Gutnick*, 526 Pa. 541, 587 A.2d 1346, 1351 *cert. denied*, —— U.S. ——, 112 S.Ct. 196, 116 L.Ed.2d 156 (1991). In determining whether there is a misrepresentation, the law equates concealment of a fact with an affirmative assertion. *See Mancini v. Morrow*, 312 Pa.Super. 192, 458 A.2d 580, 585 (1983); *National Bldg. Leasing, Inc. v. Byler*, 252 Pa.Super. 370, 381 A.2d 963, 966 (1977) (in banc); *see also* Restatement (Second) of Contracts § 160.[9] In certain instances, non-disclosure, as opposed to concealment, is equated with an affirmative assertion. *See William Goldstein Co. v. Joseph J. & Reynold H. Greenberg, Inc.*, 352 Pa. 259, 42 A.2d 551, 555 (1945); *see also* Restatement (Second) of Contracts § 161.[10] Of course, a party seeking to avoid a contract for misrepresentation must show that it reasonably relied on the misrepresentation in entering into the contract. *See* Restatement (Second) of Contracts § 164. When all the necessary factors, factual misrepresentation, materiality, reasonable reliance, etc. are shown, the contract becomes voidable and may be rescinded for fraudulent inducement. *See College Watercolor Group, Inc.*, 360 A.2d at 206; *Crummer v. Berkman*, 346 Pa.Su-

---

8. Section 162 provides:

 (1) A misrepresentation is fraudulent if the maker intends his assertion to induce a party to manifest his assent and the maker
 (a) knows or believes that the assertion is not in accord with the facts, or
 (b) does not have the confidence that he states or implies in the truth of the assertion, or
 (c) knows that he does not have the basis that he states or implies for the assertion.
 (2) A misrepresentation is material if it would be likely to induce a reasonable person to manifest his assent, or if the maker knows that it would be likely to induce the recipient to do so.
Restatement (Second) of Contracts § 162.

9. Section 160 reads:

Action intended or known to be likely to prevent another from learning a fact is equivalent to an assertion that the fact does not exist.
Restatement (Second) of Contracts § 160.

10. Section 161 reads:

A person's non-disclosure of a fact known to him is equivalent to an assertion that the fact does not exist in the following cases only:
 (a) where he knows that disclosure of the fact is necessary to prevent some previous assertion from being a misrepresentation or from being fraudulent or material.
 (b) where he knows that disclosure of the fact would correct a mistake of the other party as to a basic assumption on which that party is making the contract and if non-disclosure of the fact amounts to a failure to act in good faith and in accordance with reasonable standards of fair dealing.
 (c) where he knows that disclosure of the fact would correct a mistake of the other party as to the contents or effect of a writing, evidencing or embodying an agreement in whole or in part.
 (d) where the other person is entitled to know the fact because of a relation of trust and confidence between them.
Restatement (Second) of Contracts § 161.

per. 408, 499 A.2d 1065, 1066–67 (1985); *see also Miller*, 457 F.Supp. at 1364 (applying Pennsylvania law); Restatement (Second) of Contracts § 164(1).[11]

The record in this case shows no disclosure of the accounting problems at Bra-Con and Sciaky by Snyder to any of his superiors. It could also support an inference that Snyder's contract was offered to him and approved because of his reputation as a turn-around expert, a reputation enhanced by the false reports of the return to profitability at Bra–Con and Sciaky shortly after Snyder was given overall responsibility for them in 1984. Allegheny now says, and has said throughout, that Snyder's performance only appeared to be exemplary and likewise only appeared to be achieved according to company policy. In fact, it was not so achieved; and, if Snyder knew or should have known it was not so achieved, Allegheny may be entitled to avoid Snyder's contract and defeat his claim.

■ Fraudulent inducement based on concealment or non-disclosure will defeat Snyder's claim if Snyder's misrepresentations, *i.e.*, the early recognition of sales, the deferral of costs and the annual letters affirming Snyder's compliance with company policy, were made knowingly and Allegheny reasonably relied on these misrepresentations in promoting him. If Snyder did knowingly make such misrepresentations, his new contract would be voidable. This would be so even if he did not make the misrepresentations in order to gain promotion to his present position, unless Allegheny was aware of the problems at Bra–Con and Sciaky when it decided to enter into or ratify the 1986 contract on which Snyder bases his claim. *See* Restatement (Second) of Contracts § 162. If Snyder knew about the problems at Bra–Con and Sciaky but did not himself misrepresent the situation there with respect to premature recognition of income and delayed recognition of associated expenses, the district

court may also have to determine whether Snyder concealed the accounting improprieties from Allegheny's management and, if not, whether they were material to Allegheny's decision to promote him.

The bankruptcy court found Snyder "initiated" the practice of early recognition of sales at Bra–Con and Sciaky, but it never specifically found that he knew that practice, as it developed, was improper from an accounting standpoint. It did find, at least inferentially, that Roche's investigation had not proceeded far enough to preclude a claim of reliance on Allegheny's ignorance of Snyder's dereliction when Buckley and Scott decided to promote him in April 1986. It also found, inferentially, that even on July 23, the Personnel Committee did not have enough knowledge to preclude reliance on the misrepresentations Snyder made in January 1986 when he certified that he knew of no improper accounting practices or other violation of company policy at Bra–Con and Sciaky. Under the law of contracts as set out in the Restatement and developed in Pennsylvania, even if Snyder were not negligent in his own pre-contract performance, he may have failed to meet an obligation to Allegheny serious enough to warrant discharge because of the duties the law imposes on him under his former contract as Allegheny's agent.

■ If Snyder knew that there had been serious violations of sound accounting practices at Bra–Con and Sciaky while he had responsibility for those subsidiaries, he had a continuing duty, apart from his contract, to bring them to management's attention. This duty would be especially strong if Snyder knew those problems were either continuing or likely to continue. Any other holding would permit corporate executives to wash their hands of serious problems and obtain promotion by concealing or failing to disclose problems reflecting on their performance, either to those in the corporate hierarchy who succeed to their old positions, to those superiors who

---

**11.** Section 164(1) reads:
If a party's manifestation of assent is induced by either a fraudulent or a material misrepresentation by the other party upon which the recipient is justified in relying, the contract is voidable by the recipient.
Restatement (Second) of Contracts § 164(1).

have the power to promote them or those who have ultimate responsibility to the Board or shareholders for the success of the corporation's business ventures. Never confessing, never penitent, but ever absolved anew, they would be cleansed, at each upward step on the corporate ladder, of every former fault, no matter how important full corporate knowledge of those faults might be to the corporation's profitability or its existence. Such a rule of law would be difficult to justify in a society whose economy, to a great extent, depends on the efficient performance of private enterprise operating in corporate form. Indeed, the law has never recognized such an abdication of responsibility by corporate executives. They are agents of the corporation, their principal. Like all other agents, they are fiduciaries and, as such, occupy positions of trust and confidence on which other corporate officials must rely. Accordingly, non-disclosure of a material fact is actionable under Pennsylvania law. *Cf. Seaboard Indus., Inc. v. Monaco,* 442 Pa. 256, 276 A.2d 305, 308 (1971) ("Officers and directors of a corporation are deemed to stand in a fiduciary relation to the corporation."). If Snyder knew about the problems at Bra–Con and Sciaky, but kept his counsel on them, he violated both the duty of loyalty and the duty of due care that the common law imposes on all fiduciaries.

■ Finally, even in the absence of misrepresentation or concealment, Snyder's contract may be subject to avoidance under a theory of unilateral mistake if Snyder failed to realize problems at Bra–Con and Sciaky that a reasonably competent corporate executive in his position would have recognized and Allegheny, after adequate investigation of Snyder's abilities, promoted him in ignorance of his failure to perform his executive duties with due care. An exception to the general principle denying relief for unilateral mistake applies when the non-mistaken party "knows or has reason to know of the unilateral mistake, and [if] the mistake, as well as the actual intent of the parties is clearly shown, relief will be granted to the same extent as a mutual mistake." *Lanci v. Metropolitan Ins. Co.,* 388 Pa.Super. 1, 564 A.2d 972, 974 (1989); *see Commonwealth, Dep't of Educ. v. Miller,* 78 Pa.Cmwlth. 1, 466 A.2d 791, 792 (1983); *McFadden v. American Oil Co.,* 215 Pa.Super. 44, 257 A.2d 283, 288 (1969); *see also* Restatement (Second) of Contracts § 153.[12] Thus, Allegheny's understanding that Snyder was a competent employee who deserved the promotion offered to him may be such a mistake.

On this theory, however, Roche's investigation and Scott and Buckley's awareness of its pendency when the Committee met on July 23 to approve Snyder's contract will present a particularly difficult problem for Allegheny. In Pennsylvania "a unilateral mistake in the formation of a contract will generally bar equitable relief requested by the party who has made the mistake." *Commonwealth, Dep't of Gen. Servs. v. Collingdale Millwork Co.,* 71 Pa.

---

12. Section 153 reads:

Where a mistake of one party at the time a contract was made as to a basic assumption on which he made the contract has a material effect on the agreed exchange of performances that is adverse to him, the contract is voidable by him if he does not bear the risk of the mistake under the rule stated in § 154, and

(a) the effect of the mistake is such that enforcement of the contract would be unconscionable, or

(b) the other party had reason to know of the mistake or his fault caused the mistake.

Section 154, which is referred to in section 153, reads:

A party bears the risk of a mistake when

(a) the risk is allocated to him by the agreement of the parties, or

(b) he is aware, at the time the contract is made, that he has only limited knowledge with respect to the facts to which the mistake relates but treats his limited knowledge as sufficient, or

(c) the risk is allocated to him by the court on the ground that it is reasonable in the circumstances to do so.

Section 153, and therefore by implication section 154, was cited approvingly by the Superior Court of Pennsylvania in *Lanci,* 564 A.2d at 974–75. Only subsection (b) of section 154 would be applicable to our case. Under subsection (b), Allegheny could not succeed on the basis of unilateral mistake if it knew, or should have realized, that it could not determine without further investigation whether Snyder was being honest and forthright about the accounting problems at Bra–Con and Sciaky.

Cmwlth. 286, 454 A.2d 1176, 1179 (1983). "[I]f the mistake is ... unilateral, and not due to the fault of the party not mistaken, but to the negligence of the party acting under the mistake, no basis for relief [is] afforded." *Rusiski v. Pribonic*, 326 Pa.Super. 545, 474 A.2d 624, 627 (1984), *rev'd on other grounds*, 511 Pa. 383, 515 A.2d 507 (1986); *see also Pittsburgh Nat'l Bank v. Larson*, 352 Pa.Super. 250, 507 A.2d 867, 868 n. 1 (1986); *Patterson v. Reliance Ins. Cos.*, 332 Pa.Super. 592, 481 A.2d 947, 951 (1984) (quoting *Rusiski*, 474 A.2d at 627); *McFadden v. American Oil Co.*, 215 Pa.Super. 44, 257 A.2d 283, 288 (1969) (in banc).

None of these issues relating to fraud and mistake are, however, for us to decide. They are for the district court on remand. We mention them only because they are likely to come up in the further course of these proceedings on Allegheny's objections to Snyder's claim.[13]

### V.

The judgment of the district court affirming the bankruptcy court will be vacated and the case will be remanded to the district court so that it may vacate the bankruptcy court's judgment and remand the case to the bankruptcy court for further proceedings consistent with this opinion.

SEITZ, Circuit Judge, dissenting.

As the majority notes, it is a truism reflected in Pennsylvania law that a contract must be in existence before it can be breached. Thus, Snyder's pre-contract activity was not relevant to Allegheny's breach of contract defense. Nor did Snyder's alleged continuing violation of company policy constitute a breach of contract. The majority opinion reaches the same conclusions and, of course, I agree. Thus, the judgment of the district court based on those defenses was properly reversed.

However, rather than directing an outright reversal, the majority remands for trial Allegheny's belated claim that Snyder's pre-contract conduct, if not fully revealed before formal approval of the contract, would constitute a fraud or mistake with respect to execution of the contract. It does so because it believes that the fraud and mistake defenses were raised at least in the district court. I cannot agree.

One searches the record in vain at every level to find any reference to a defense based on mistake in the execution of the contract. In my view, it is not consonant with the justice requirements of our adversary system to remand for a determination of an issue which will require a trial of a defense first raised by this court. Nor, in my view, do the ends of justice dictate that the case be remanded for a trial on the issue of fraudulent inducement.

The only mention of fraudulent inducement in the bankruptcy court was made by counsel for Snyder in his closing remarks. He stated that there was "no claim by Allegheny that Dan Snyder fraudulently induced ... [Allegheny] to enter into that contract, nor could there be because after the accounting issues had been investigated.... the Human Resources Committee of the Board approved the written contract." (Tr. of Trial on Objection to Claim of Snyder, at 162–63.) Allegheny's counsel did not challenge this statement.

The district court, in reviewing the bankruptcy court's order on appeal, also made no mention of a theory of fraudulent inducement. It merely affirmed the bankruptcy court's conclusion that Snyder's conduct breached the contract due to the fact that the accounting improprieties continued past the date of the new contract. The majority relies upon the district court's statement regarding the Committee's awareness of the Roche investigation as proof that the theory of fraudulent inducement was presented to that court. In my

---

**13.** Our remand is based largely on our conclusion that the evidence before the bankruptcy court was sufficient to permit, but not compel, a finding that the contract was voidable for mistake or misrepresentation. Findings on all the issues we have noted may arise on remand will not be necessary if the district court decides the issue of knowing misrepresentation against Snyder. *See supra* at 178–180.

view, this analysis does not comport with the record. First off, there is absolutely no showing that Allegheny's counsel presented the theory to the district court. Moreover, I do not believe a reasonable reader would divine from the district court's language that it was referring to a fraudulent inducement theory. Even if the language can be stretched to show consideration of the theory of fraudulent inducement, that consideration by the district court would necessarily be of an issue presented for the first time on appeal from the bankruptcy court.

A court of appeals generally will refuse to hear arguments not heard by the trial court absent exceptional circumstances or in order to avoid a clear injustice. *Am. Disabled for Accessible Public Tr. v. Skinner*, 881 F.2d 1184, 1197 (3d Cir.1989) (en banc); *B.B. Rider Corp. v. C.I.R.*, 725 F.2d 945, 951 (3d Cir.1984). The decision whether to reach such arguments is, of course, committed to the discretion of the reviewing court. *Singleton v. Wulff*, 428 U.S. 106, 121, 96 S.Ct. 2868, 2877, 49 L.Ed.2d 826 (1976). This holds true for a district court in exercising its appellate jurisdiction over bankruptcy matters. *In re Reliable MFG. Corp.*, 17 B.R. 899 (N.D.Ill.1981), *aff'd*, 703 F.2d 996 (7th Cir.1983); *see In re Monroe Park*, 17 B.R. 934 (D.Del.1982).

As I read the record the issue of fraudulent inducement was first noted in a delphic way in Allegheny's answering brief on appeal to this court. Moreover, at oral argument the following colloquy took place between this court and counsel for Allegheny:

> THE COURT: Now, wait a minute. You really, I mean aside from the election problems that come up with rescission, you didn't really try to present that theory, did you? You didn't try to defend on the ground, you didn't try to defend on the ground, that you had reason to rescind his contract.
>
> COUNSEL FOR ALLEGHENY: Never
>
> THE COURT: Okay.

I do not find any special circumstance or clear injustice that would warrant sending this case back for a trial of this new issue.

I would therefore reverse the judgment of the district court with a direction that it in turn reverse the order of the bankruptcy court and direct the entry of an appropriate judgment for Snyder.